L.L.C. All right, we call United Biologics v. Allergy and Asthma. Ms. Lowe, we're ready for you. Thank you, your honor. May it please the court. Appley successfully argued to the trial court that in a room full of co-conspirators, the last one standing walks out scot-free. In agreeing with Appley, the trial court erroneously held that as a matter of law, a defendant cannot be liable for the acts of a settled co-conspirator. This is wrong. Texas and federal law clearly establish that a defendant can be held liable for the acts of a settled co-conspirator. The trial court dismissed appellant's civil conspiracy claim as a matter of law despite legally sufficient evidence that Faudia, a billion-dollar pharmaceutical company, interfered with United Allergy Services' contract with physicians, three of which included AAAP members, and did so with the appellee's help, a classic civil conspiracy. This trial court error put up an impenetrable roadblock from the jury to do its job and considered the defendant's conduct and liability under the common law claim of civil conspiracy. To remedy this error, this court should reverse and remand for a new trial on UAS and AAAP's civil conspiracy claim for three reasons. First, the trial court erred as a matter of well-established Texas law that a defendant cannot be held liable for the acts of a settled co-conspirator. Second, legally sufficient evidence demonstrated that a settled co-conspirator cautiously interfered with UAS' contract with AAAP members with these appellee's help. And third, preventing the jury from considering this aspect of the defendant's common law liability harmed UAS and AAAP and resulted in an incomplete and improper verdict. Regarding the first question. Okay, I want to ask you, can I just get right to the second one, which is the evidence? It's not enough to show that having met me, you now don't want to have this contract with Mr. X, you'd rather have it with me. You have to show that I caused you to violate the contract. So what evidence do you have that anything FADIA did, assuming argumentative they should have been submitted to the jury, that anything they did caused anyone to breach their contract? Thank you, Judge Haynes. There's multiple pieces of evidence, but perhaps the most direct one is an internal meeting or email rather of FADIA representatives where they talk about visiting a company called HCA or Hospital Corporation of America. They talk about, they know that they're in contract with UAS and that they suggested to that entity that UAS was engaged in fraud. And the email itself says that the HCA people reported back to them that they went up the chain through HCA management and decided to terminate the contract because they did so in breach of the contract. We believe, Your Honor, that it would be a termination that was wrongful under the contract because it was not done with the proper notice and things of that nature. It was not an issue at trial. I think whether or not the defendant breached, I'm sorry, whether or not the target breached, I think is an interesting question. Reducing performance alone would be enough to be damages under Texas law, but breach as well, which they did by terminating. That was not an issue that seemed to be challenged below, but our reading of Texas law is that tortious interference with contract is actionable and damaged even if there's a reduction in performance under the contract. So in other words, there were other contracts where the target, the physicians clearly stopped testing and treating patients because they were scared that were committing fraud by being in contract with UAS. Again, these are other emails which are testified to by the body of representatives for the body of representatives. What is your best case for the proposition that tortious interference with contracts does not require that there be any violation of the contract by the contracting party? Your Honor, the, uh, I believe the Walmart versus Sturgeon case talks about the fact that you don't require a breach itself, but we also briefed us in our reply brief when we argued about, they argued that we didn't point to a single breach. And we point out that Texas law does not require a breach of the contract or termination. It only requires a reduction in performance. If I may, I'm turning to our brief. Okay. But that's talking about, those are two, there's two separate pieces here. Tortious interference perspective contract requires that the interferer themselves commit and independently towards the fact that's separate from whether the party who is the party to the contract has the right, let's say, to terminate tomorrow. And they do. And you say, well, that's because they talked to Fadia. Then tell me why that is towards the contract. That's, that's a good question, Your Honor. And the answer to that is if they, if they terminate without the proper notice and they terminate without performing under the contract is required by the contract, then that would be tortuous interference. I understand there may be a defense that they had a right of termination, but we believe that affirmative defense was not argued or raised by the evidence or argued by the defendant. So this issue not having come up. Help me in looking at the record, where do you want me to look in more detail to find that you showed they did follow the contract? Did an entity such as HCA violated the contract, Your Honor? Right. The contracting party, not, not what did Fadia do, but what did the contracting party do? If you want to point me to what's your best evidence on that? Okay, Your Honor. We have evidence of the THPG contract being diminished or not expanded as required under the contract at the record 9255 and as well as 9274 through 9277. This is testimony regarding the after visits by the defendant and Fadia that performance under the THPG and including THPG expanding the relationship as required under the contract did not occur. The HCA was subject of testimony by Mr. Phil and Mr. Hollis in terms of loss of that contract. And again, I don't believe that there was necessarily argument below that, that that loss was the right to terminate, but that the testimony was that they would not have terminated otherwise. And so it's, it's not that they had a right that they were exercising under the contract that was the violation. We allege it was the disruption of that contractual relationship that was the tort. And so I understand the case law that says that convincing a defendant to exercise a right under the contract, convincing a contracting party to exercise their right under the contract is not cautious, but I think that's somewhat different than convincing someone to walk away from a relationship and terminate without notice and telling them why, because you've scared them into thinking that they're committing fraud by being in that contract. I think that's where the line is crossed. It's when you go and you tell something that you know is wrong and false, and then you convince that party to either end the relationship or reduce performance under the relationship. It's not like they told them, you know, under this contract, you can just do this or do that or charge more money or pay less. They went much further than that. You're correct, Your Honor, also that the tort of interference with prospective relations requires independent tortious conduct. Certainly there was that, but that is not a requirement of interference with contract. That's why we believe that even the tortuous interference with contract elements are easier to prove and lesser than prospective relations. Your Honor, I may also, just to give the court, since we're on the second point, I'll start there first and go to the first, but the legally sufficient evidence, I think, needs to be understood in the context of how much was offered compared to the other claims which were asked versus the one that was not. We offered 17 witnesses, 60 hours of testimony, and over 180 documents of FADIA tortiously interfering with UAS's relationships. FADIA representatives going to places where they know UAS is in contract with a physician, secretly telling those physicians, if you're doing business, you're engaged in fraud, and at times finding physicians who are considering that relationship and telling them, if you're doing business with UAS, you're engaged in fraud, and then reporting back to their superiors in email, which is indefensible, that they were successful at causing either the termination of that agreement or the agreement never forming in the first place. Whether or not it was tortious and intentional is not only clear from the emails, but the FADIA representatives at trial, the corporate was wrongful, that it shouldn't have been done, that it was inappropriate. And doing this with the appellee's help. Specifically, Tanya Winders, one of the two remaining defendants, used to work at FADIA. She drafted the plan in August of 2012 called the Remote Practice of Allergy Strategy to put UAS and physicians out of the allergy business. She then goes to ANMA, or Mothers of Received hundreds of thousands of dollars a year and starts to carry out the plan in conjunction with FADIA, creating articles for the FADIA representative that they actually took into physicians' offices and successfully used to scare the physicians. And also having meetings and emails, which were admitted to at trial by her after that conduct occurred, they were coordinating. And also sending letters to 127 different insurance companies, telling them the exact same story that the FADIA reps were using to scare the physicians. Being in contact with an entity such as United Allergy Services means you're committing fraud. No one at trial said that that's true, because it's not. And at least under the standard that this court has on legally sufficient evidence, it's whether or not the jury could believe or disbelieve this tortious conduct occurred. And we believe that the jury could have, yet they were not asked. And we believe that the jury could have determined that those physicians would not have terminated but for the acts of FADIA representatives with the athlete's help, but they were not asked. Now, the other side says they weren't asked because we didn't ask them. But respectfully, we didn't have the opportunity to ask them. The trial court issued a judgment as a matter of law at the directed verdict stage, eliminating the civil conspiracy claim. And so without the ability to ask them, we weren't able to. Now, what the issue is, is the judge's judgment as a matter of law. Was that correct? Almost 50 years ago, the Texas Supreme Court said in McMillan that joint tort feasors cannot escape liability just because another one settled. Yet that's what this court held on the basis of West Fork. In our reading of McMillan and in the more recent clinic opinion from the Court of Appeals, which has been substituted but still remains, that's improper. Texas public policy encourages settlement and discourages litigation. But allowing the last one standing to avoid liability altogether encourages litigation and discourages settlement. Encourages you to lay behind the log with hopes that you will not be- Chapter 33 of the Texas Civil Conspiracy Claims. ... harmless. But these are other torts with other elements, such as antitrust, which has other things that we weren't required to prove, or tortious interference by them directly. But I think what's telling is that in closing argument, they told the jury, I quote, in considering the tortious interference claim, the only conduct you may consider is the conduct of misconductors and the conduct of mothers of asthmatics. This jury was justifiably perplexed for four days deadlocked because they had heard two and a half weeks of testimony of FADIA representatives interfering with UAS's contracts, but didn't understand why they were given that, much less how to answer it. They've gamed the system, and contrary to binding precedent, saying that we could not even ask that question. Now they say we did not ask it. That's not fair, and for reasons we have given, we believe this court should reverse and remand for a new trial. All right. Thank you. You've saved your rebuttal time. Thank you. All right. All right. We're ready. Ms. Stone? May it please the court. This court should affirm the district court's directed verdict for at least three reasons. The first is that at no time did UAS, as required, submit for adjudication the issue of FADIA's liability for tortious interference, which it was required to do under binding Texas Supreme Court law. Second, even if that question had been submitted, there was insufficient evidence for that question to go to the jury. And finally, even if it had gone to the jury, the jury's answer to question nine on the Noor-Pennington defense provides a complete defense to the claim. I do want to address one of the points made by Mr. Lowe, which is his belief that the basis for the district court's grant of the directed verdict was a belief that settlement precluded conspiracy liability. That's not what we argued on the directed verdict. You can see that in the record at page 11-434 is where it begins. We discussed the West Fork case specifically at 11-425. And the argument made there was that FADIA's conduct could not be adjudicated. Settlement was among the circumstances that prevented that adjudication, but the primary reason is the one that the district court identified in denying the motion for new trial, which is that UAS never sought to obtain that finding. And that is a mandatory and critical requirement. Secondarily, there was never any argument that Mothers is the beneficiary of a release given to FADIA in the settlement. That's the McMillan-Clinginsmith case that's relied on by UAS. It has no bearing here because that was not the argument made. No one's saying we were released. What we are saying is what the Texas Supreme Court said, what the pattern said, that in order to have liability for civil conspiracy, someone has to have committed a tort that is completed by that tortfeasor. And only then is there derivative liability through conspiracy. That's what this case was. It looked remarkably similar to West Fork, which is that FADIA had settled and been dismissed from the case. That took the issue of FADIA's tortious interference out. In order to have a conspiracy finding, we're not saying it never could happen, but in order for that to happen, there had to be a resubmission, a reintroduction of that issue into the case. And at no time did that happen. We can see that throughout the record. We see that in... Ms. Stahl, you're not taking the position that they could not have submitted FADIA. It's just you're saying they didn't. That's correct, Your Honor. They didn't. And Judge Lambert, in concluding, in denying the motion for new trial that they didn't, is absolutely spot on. We can see that in the motion to dismiss pursuant to the settlement. That's a joint motion. UAS representing to the court, this claim's out of the case. We're not going to have it tried. We saw it in the whole circumstance of the trial. And I do have to take issue with UAS's current characterization of the case. Their position at trial was that Tanya Winders was the mastermind of this conspiracy. The locus of the interference was Mothers with FADIA assisting. But in any... You can see that in their opening statement. You can see it happens around... I just want to be clear that under Chapter 33, which I realize is meant to benefit a defendant for the most part, still it's clear you can submit a settled party's conduct. It's just that ultimately a judgment against that settling party won't be entered. And you can even submit a third party that has never been joined as long as the defendant names them. So this notion that you can't put somebody in a jury charge who isn't in the case is just not accurate in my view. Am I right on that? You are correct. And in the context of damages where liability has been established and the predicate issues necessary to liability have been submitted and determined, then yes, in the damages context, you absolutely can under Chapter 33 submit for determination. Correct. If you had a correct plaintiff versus A and B and B settled, the case would be that the negligence, if any, of the following persons caused the occurrence in question, A and B, even though one of them has settled. Then you go on and you have the proportionality and then you go to damages. That's how that would look. So I don't see why this couldn't have looked that same way, assuming, arguably, there was evidence that FADIA interfered and so on. That's a separate question. And I don't disagree that it could have looked this way, but it did not. And the reason it did not is because UAS never asked for it. And so what the district judge was faced with at the time of the motion for directed verdict were the issues that UAS had submitted for determination. And I think it's important to note that it's the plaintiffs who control how they plead, prove, and submit their case. And the best evidence of the issues to be submitted by UAS for determination by the trier of fact are the jury instructions that it requested. And we discussed at length, I know they're going to say, well, we asked for individualized findings on the conspiracy claim, but we explain at length in our brief about page 36 is where the argument starts. The conspiracy question as constructed would not have elicited a finding that any individual co-conspirator had completed the tort of tortious interference. What that instruction said is that people can commit acts in furtherance of the conspiracy, but it didn't require that there be a predicate act. And so it wouldn't have elicited that finding. So we're not saying you can never do it. In fact, both sides have cited cases where that could have happened. The Boynton case that we cite too, that's a circumstance where the settlement allowed for a finding of liability because it had been conceded. There was an affidavit of liability essentially submitted in connection. So nothing precluded a finding that that defendant had settled or that they were liable. The Clinette case, which is cited to us in the reply by UAS, if you read what happened in that case, there was a settling defendant in ancillary litigation. And then the case before the court was a bench trial where the only claim submitted was conspiracy. So there was no claim for the predicate tort and the defendant or the party who was alleged to have committed the predicate act was not a party. Nevertheless, the findings and conclusions that that trial judge entered in that case went ahead and made a specific finding that Kevin Casey, the alleged tortfeasor, was a fiduciary, that he had breached that fiduciary duty, and only then was the conspiracy question to be determined. It just underscores the importance that there be a predicate act. Let me ask you this. Let me ask you this. Counsel officer was asked by Judge Haines, you know, cutting to the chase, what is the evidence? Where is it? I mean, assume in arguendo judge should have given a charge. I mean, what's the evidence that triggers it versus, okay, it was an error and it was harmless. So he cites us to record pages 9255 and in record 9274 and 9277. So what do you say those pages show with respect to this issue, if anything? Your Honor, I'm not sure that I can have 9277 on my fingertips at the moment. I can tell you that as a general matter, there was not sufficient evidence of causation in this case. Looking to HCA contract in particular, they cite to a single email. That email on its face makes two points evident. The first is that we're talking about prospective relationships. So what it says is that HCA was considering entering into a contract with UAF. That puts it squarely in the prospective relations bucket. We have argued and I contend vehemently that this is all a prospective relations case. You can see that argument begin at page 40 of our brief and we pick it up again in discussing the absence of evidence that there's independently tortious conduct. But in any event, the HCA email itself shows that there was independent consideration of the issue and a decision by HCA not to go forward. I would add that the HCA contract is not in evidence. So this notion that HCA violated some term of the agreement that required notice is not of record in the case. There is no evidence of that. With respect to THPG, I'm going to guess that the citation from the record is to Mr. Phil's testimony. What Mr. Phil testified was that changes in insurance caused a decrease in performance under the THPG contract. Mr. Hollis, who was the former CEO and actually was the CEO I believe at that time, testified that the decline occurred in 2011 and 2012. You can see that at page 10,500 of the record. And there, that decline in performance predates the alleged interference by FADIA, the supposed sales contact. So with respect to THPG, again, causation disproved. They didn't have sufficient evidence of that to bring it to the jury. The rest of their causation case rested upon the shoulders of their damages expert, Dr. House, and he testified unequivocally. He could not testify to causation. He has no knowledge with respect to that. That's at page 10,708 of the record. So we contend, Your Honor, that there was insufficient evidence. And related to that point, there was insufficient evidence of an independently tortious act that would have supported interference with prospective relations. Let me ask you on the jury charge issue, I think you're correct under Texas law, if you don't submit a well-written jury charge question, you're not going to win on appeal for the most part. I'll just say that as a general rule. In federal court, we apply state law to the substance, but we apply federal law to what do you have to give to the judge in order to have an argument that they should have submitted the question or a question on that topic. So tell me what's your best case on federal law that they failed to articulate a proper jury question on this point? Your Honor, I don't have that as I sit here today. I'd be happy to supplement with that. I hear embedded in the question a concern that maybe this is a charging issue, but it's not. The predicate act, the necessity for a predicate act is a substantive matter that can't wait for charge conference, and here's why. If we had waited and there was submission of the conspiracy question as proposed by UAS in this case, then we would have had a circumstance where I would, and there was an adverse ruling against my client, we would be in a situation where I would be the party seeking a post-verdict motion to undo that conspiracy finding, and in order to do that under Rule 50, I would have been required to raise it at the directed verdict stage. And so a defect of this nature, which is more akin to a pleading defect than a charging defect, it needs to be addressed and was appropriately considered and decided by Judge Lambert at the time. So we talked a little bit about the insufficiency of the evidence. There was no reason on this record to submit the conspiracy question, even if it had been asked for, but it wasn't. I do want to also address the necessity of the finding with respect to the conspiracy question. So one of the things argued for the first time in reply was, well, we relied on the pattern. If you look at the pattern at PJC 109, at the very top, before you even get to the guts of the question, it says specifically it is conditioned upon the finding of a tort other than negligence or a statutory violation. And so the pattern itself incorporates the principle set out in Tilton v. Marshall that make it very, very clear that you've got to have a predicate, a finding of a predicate tort in order to have a conspiracy question even make it to the jury. And that didn't happen in this case. This wasn't even identified as an issue to be determined in the pretrial memorandum, which you can find at 6895. And finally, the last point on that, there's a suggestion in the reply, again, for the first time, that the defendant had an obligation to raise this issue. That is not the law. It is the plaintiff who controls what issues are submitted for determination. And this court in Hadley at 44 F3rd 372 specifically noted in the context of punitive damages there that the defendant has no duty to ensure that the plaintiff has furnished jury questions covering all fact issues necessary to his cause of action. And that's what happened here. They didn't submit it. We think they couldn't. But regardless, it doesn't really matter what the reason is, they did not. And so going to your question again, Judge Haynes, there could be a circumstance where you could submit this. But that circumstance includes the plaintiff requesting it. And that didn't happen here. I wanted to say a few words about the jury's answer to question number nine, which was the Noor Pennington question. If the court had submitted the conspiracy question, they would not have found or even if they had found that there was a conspiracy, the Noor answer undoes any liability there. And this really goes to the second issue that the plaintiff identified in their appeal, which was, you know, did the jury's other findings preclude a finding of liability on conspiracy? And the answer to that question is absolutely yes. Their findings did and it's also why Judge Lambert, in the motion for new trial, referred to the Noor holding or the Noor answer as evidence of UAS's windmill tilting. Question nine asked the jury whether the agreement was an effort to influence the government. And the agreement that had been presented at trial was this anti-trust conspiracy that included all of the predicate acts that are being relied upon for tortious interference, whether by mothers or Fadia or the allergist. It was all presented and all considered by the jury. And they looked at that and they concluded that it was part of mothers' efforts to influence the government and protected under Noor. And again, that finding has ample support in the record. We can see it in the evidence that they're citing in their own briefing, for instance, record at 13165. That's an email they rely on to say, there's this coordination between Fadia and mothers. If you read that document, what it shows is that mothers was asking for public relations support in connection with its legislative initiative. That falls squarely within Noor. The evidence regarding mothers' protected activity was elicited on questioning by UAS of their own witnesses who they called in their own case. That's the testimony of James Wallen. You can see that at page 9946 of the record and again at 10001. The evidence was that mothers had a fully integrated public relations campaign ancillary to its efforts to seek regulatory changes that would deal with the remote practice of allergy. You can see that in the four strategic pathways document. That's at 13398 of the record. There was ample evidence for the jury to return and answer yes to the Noor-Pennington question. And because all of the conduct was the same, that whole finding, it's dispositive of any conspiracy that might have been submitted with respect to tortious interference. I just want the court to consider what UAS is asking here. They're asking for a second chance to ask for and obtain a finding of tortious interference against Fadia which is absolutely required so that they can then seek conspiracy liability against mothers. And given the record here which includes a concession that Fadia has been settled out of the case and they have been dismissed, that's a far-fetched and unwarranted conclusion or opportunity to give them. UAS has never said either in the trial court or here that it will seek an affirmative finding of a predicate tort by Fadia. And we think that they can't. They can't because we think their agreement precludes it. And in any event, the evidence doesn't support it. And so for all these reasons, district court's ruling on the directed verdict should be affirmed. All right. All right. Thank you, Ms. Stahl. Back to you, Mr. Lowe, for rebuttal. Appellants did not seek a finding on the civil conspiracy claim and were not given a first bite at the apple because we weren't allowed to. The trial court issued a judgment as a matter of law before the jury charge conference and before the jury was instructed and adopted the erroneous legal theory that you cannot be liable for the acts of settled co-conspirators if you're the last one standing. That's not the law. And so by making that determination, they spend all their time trying to cover it up by saying, well, it's harmless in some way or fashion. The first argument that they make is that, well, we didn't ask, but we weren't allowed to ask. They argued below successfully that we couldn't ask. Let me understand. I mean, I hear you saying that you've said it before, but, you know, we're going to read this record and, you know, having been a trial judge myself, I mean, we'll look at this record. So where is it going to jump out at me that the trial, the judge was just, well, I don't want to say obstructing, but just inhibiting your ability to do what counsel says you should have done. You're a very experienced counsel. I'm not sure if you tried the case, but I mean, this is a jury trial. It's full blown. I mean, it's in motion, it's going and blowing. You all are familiar with Texas law and so forth. So I hear what you're saying, but when I read this, I mean, where's it just gonna get me that the judge didn't get it. I mean, he's barring you. Am I going to read on the record where you're asking the judge to do it and the transcript is going to say, no, is this a chambers conferences? Oh no, your honor. Uh, you you're wrong. I mean, other than just you saying it, don't get me wrong, but I'm just saying when I read it, how am I going to conclude that the judge missed the Texas point or otherwise it's just completely barring you from doing what you want to in a full blown jury trial that that's revved up. That's what I'm asking. I do your honor. Thank you. And two places. First, we put it in the record excerpts, page one 35 of the record excerpts. You'll see the question where the instructions we were proposing straight out of the pattern instructs the jury. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy. And this is a entire paragraph on whether or not the appellees can be liable for the civil conspiracy of the conduct of the co-defendants, including tortious interference on which you're instructed on, on the prior page. The second place is that record site one one three nine one. This is the part of the jury charge conference where the only objection that the defendants have to this instruction is that we said conspiracy is out. So it's out. In other words, they objected to us asking because the jury, the judge had already tossed the civil conspiracy claim prior in the judgment matter of law stage. Now, if they wanted to say, oh, you have to ask about the underlying conduct that is objection has been on them. And then we have an opportunity to fix the charge or the instruction and resubmit it. Then the trial court rules on that. Then the jury answers that. And then we know what happens. But all of that speculation is pretty far afield from what actually happened, which is they made one objection and one argument. We couldn't ask. And the judge bought it and prevented us from asking. We are. We did submit also a special verdict form, which is also in the record excerpt where we asked specifically about body. And this is record excerpt one thirty eight, where Fadi is listed as the co-conspirators. Now, if the jury had had checked, yes, the body, there would be no question that Fadi was the one who carried out the tortious conduct, especially since the jury answered no to whether or not Emma and Wenders were themselves the perpetrators. Fadi was the perpetrator. That's the problem. That's what most of the evidence was. Whether or not Emma was effective or not is a different question. This goes to the company goes secretly door to door to physicians to convince them they're engaged in fraud is not more pinning. And it's not government petitioning. It's not free speech. It's actionable. They bring up all sorts of other things that they introduced into this trial. But for this claim, the civil conspiracy claim for Fadi interfering with U.S. contract and endless assisting them by providing them weapons to use in those meetings, that's not government petitioning. And finally, I do want to address, because Judge Haynes, you did ask about it. We did cover in our reply brief, the question you asked me right off the bat, which is best case for you don't have to have a termination of contract. Page four of our reply brief, we cite community health systems, professional services, which is a Texas Supreme Court case says you don't have to have the contract. And then we cite international unit auto aerospace, which is a Dallas court of appeals case, which says that reduction performance is not. We also have footnote 12 and 16, which lay out all the record sites about the various elements of causation of the termination or reduction performance of these contracts, which the jury should have been entitled to believe or disbelieve because that's their role respectfully, if not conclusively proven otherwise, that we respectfully request this court remand for a new trial so that they may do so. We appreciate your time. All right. Thank you, Mr. Stahl. Thank you for excellent oral argument to us and pointing us to what we need to look at hard, both in the record and the law. Appreciate both of you participating in this meeting. The case will be submitted and we'll figure it out and let you know when we do. Thank you. Stay safe. Stay safe. Thanks.